# Exhibit B

**SUSAN J. FIESTER, MD**
**Psychiatry, Forensic Psychiatry**

**6 Vendome Court**  **301.365.4980 (Office)**
**Bethesda, MD 20817**  **301.469.8772 (Fax)**

August 30, 2021

Steve Harvey, Esquire
Steve Harvey Law LLC
1880 John F. Kennedy Blvd., Suite 1715
Philadelphia, PA 19103

Re: James Ryu

Dear Mr. Harvey:

At your request, I examined Mr. James Suk Joon Ryu to determine if he suffers from any psychological or psychiatric symptoms or disorders or any other negative consequences resulting from his being wrongly accused of embezzling money from Bank Asiana in 2014. He is alleging malicious prosecution and defamation of his character. To this end, I performed a comprehensive psychiatric examination of Mr. Ryu at my office in Manhattan, New York City for approximately seven hours on November 14, 2019 and by telephone for approximately two hours on July 20, 2021. In addition, I reviewed documents including: Complaint with exhibits of 3/19/14 (84 pp); Amended Answer with Affirmative Defenses Counterclaim of 6/10/14 (26 pp); Sealed Opinion on Motion to Enforce Settlement of 8/12/19 (7 pp); Complaint of 10/15/19 (58 pp); Report and Recommendation on Ryu's Mtn for Default Judgment (9 pp); Vocational Economic Evaluation of James S. Ryu (13 pp); BOH's Motion to Voluntarily Dismiss Its Claims against JR (11 pp) (124 pp total) (100 pp total).

BACKGROUND INFORMATION

Mr. Ryu was born on February 18, 1965, in Seoul, South Korea and is 56 years old. He is a permanent resident of the United States. He has been married to Anna Du Hee Ryu since 1994 (27 years). She is 50 years old and has some college credits. She is a homemaker. She is South Korean and is also a permanent resident of the United States. She is in good health. Mr. Ryu and his wife were living in River Vale, NJ at the time I first interviewed him, but he and his wife are now living in Wayne, NJ. He is currently renting out his original home and is living in a rental home. There was a pandemic forbearance during COVID, so he was using the rental income of $3,250 per month for living expenses. Recently, the forbearance program stopped, and he currently owes about $54,000 in back mortgage payments.

Mr. Ryu started working at New Millennium Bank in April 2021 (the bank that was taken over in 2014) as a special assistant to the CEO at a salary of $120,000 per year with

health insurance.  It is a relief and at the same time feels upsetting as he was to become the COO of New Millennium after the takeover.  He was unemployed for seven years.  Although he is grateful to have obtained a job in banking and enjoying catching up on the latest developments in the industry, he is seeing many employees who were previously subordinates of his in the hierarchy who have advanced ahead of him.  He holds out hope that he will be able to advance in the future.  He is managing a special project similar to a merger, trying to develop a mortgage lending unit group to join the bank as a separate division.  He is managing the process.  His commute is longer, about 25 miles each way.

In early 2019 he received an offer of judgment from Bank of Hope who wanted to avoid a trial.  They initially agreed to pay $350,000 but then reduced the amount.

The couple has two children.  Their daughter, Jamie, age 22, graduated from New York University in 2021.  She is single and has no children.  She is trying to find a job in NYC in publishing or journalism.  His son, James, age 18, recently graduated from high school in Wayne, NJ.  He plans to attend the College of New Jersey in the fall.  (He was also accepted at Penn State, Rutgers and UC Santa Cruz but could not afford the tuition at these other colleges.)  His daughter has been seeing a therapist for years as a result of stress related to her father's legal situation.  He does not believe that she is being treated with any psychotropic medications.  Both his children are in good health.  He has also been dealing with anger from his son related to the false accusations and the related consequences.

Mr. Ryu's mother died in 2017 at the age of 82 from kidney failure.  She also suffered from dementia.  She was a college graduate who was a homemaker.  His father is 85 and lives in Los Angeles, CA in his own home.  He lives with Mr. Ryu's brother and sister-in-law.  His father is a college graduate and owned a dry-cleaning business in Los Angeles.  He retired at the age of 75.  He was diagnosed with a rare form of lymphoma in 2018.  He has been treated and is in remission.

Mr. Ryu has two older siblings.  His sister, Jin Yi Byun, is 62 years old.  She is married and has two adult children.  She has some college credits and is a homemaker.  She lives in Los Angeles, CA.  His brother, Alan, is 59 years old.  He is married and has two children.  He is a college graduate who works as a court interpreter.  Both his siblings are in good health.

His grandparents are deceased.  He had contact with both his maternal and paternal grandmothers while he was growing up.  His paternal grandfather was deceased.  They lived in the neighborhood nearby, and he would see them for holidays.  He also had aunts and uncles as well as cousins in the area with whom the family socialized.

When Mr. Ryu was born, his parents were living in a home they owned in Seoul, Korea.  His siblings were four and six years old.  His father was the owner of a brewery.  The family was upper middle class.  His mother's pregnancy with him and his birth were normal.  He was born full-term by vaginal delivery.  He had normal developmental

2

milestones. He was physically active and well-coordinated. He had no childhood behavioral problems. Discipline was primarily verbal. He was spanked once or twice for predictable misbehavior. He was never emotionally, physically or sexually abused by anyone within or outside the family.

The family was Buddhist and celebrated the holidays and attended temple. The family environment was stable and predictable. His parents moved several times, always upgrading to a better apartment (in Korea, it is preferable to live in an apartment versus a single family house/home). His parents' marital relationship was without overt conflicts, and there was no domestic violence. He felt loved and well cared for. He got along well with his siblings except for normal sibling rivalry. He was a happy child and has many childhood memories including hitting his head on a metal vault (no loss of consciousness) and playing with other children in the neighborhood. The family always dined together in the evenings. His father was actively involved in parenting.

Mr. Ryu started school in first grade at the age of seven. He attended public school throughout. He did not enjoy school or studying but performed well academically, receiving A's and B's. He got along well with his peers and teachers. He did not participate in any sports, clubs or activities but took singing lessons when he was very young. He attended school in Korea up through the middle of his eighth grade year. At that time, his siblings were still living at home (one was still in high school, and the other was about to leave for college). During middle school, he continued to perform well academically.

When he was 13, Mr. Ryu's father and mother emigrated to the United States. His father's brother took over ownership of the family-owned brewery in a hostile manner, and the other brothers helped run the business. The family moved to Los Angeles because his parents knew other Korean immigrants who lived there. They lived in an apartment in the city proper and later moved to a home in the San Fernando valley. The transition was somewhat difficult for Mr. Ryu. Although he had studied some English, he was not fluent, so communication was difficult. His academic performance declined somewhat as a result of his language difficulties but eventually improved. He did not mind leaving his friends but found the culture to be "different." There was less academic pressure. It was the end of the "hippie" era, so many people had long hair. He had previously been required to wear school uniforms and maintain a nearly-shaven head. He made friends including close friends. He began playing the electric guitar (self-taught) and excelled. He played in several bands, performing on occasions. The other members of the family did not have trouble adjusting. His sister attended a local community college. His father purchased and ran a dry-cleaning business.

Mr. Ryu dated during his senior year of high school but had no significant relationships. He continued to have close friendships. The family started to attend the Korean Community Church (Christian). Although the family members were no longer able to visit with relatives, they became part of the Korean immigrant community in Los Angeles. His father's business did well, and the family maintained a middle class socioeconomic status. He reports occasionally being bullied at school and on the street

3

because of his Asian heritage, but it was minimal, and he feels it had no significant negative effect on him.

Mr. Ryu graduated from high school in 1983. He left home to attend the University of California (UC) at Santa Cruz. He lived in a dormitory. The transition was not problematic especially as some of his best friends were also attending Santa Cruz. He made new friends as well. Academically, he received mostly B's and C's. He majored in astrophysics but later changed his major to economics. He attended college for four years but did not graduate in 1987 because he was lacking a few credits. He enrolled in a college exchange student program run by UC and studied at Yonsei University in Seoul from 1987 through 1989 under their graduate level studies. He enjoyed the program and the opportunity to reconnect with his cultural heritage. He received better than average grades. He met new friends and spent his leisure time at cafes and attending music and movies among other things. He was also working as an English instructor at a variety of venues. He dated and had a few shorter-term relationships.

Mr. Ryu graduated from college in 1989 and returned to Los Angeles to live with his parents. He obtained a position with Wilshire State Bank as an officer in training. He performed well and was soon promoted to a position in lending operations at new branch in the San Fernando Valley near his home. He worked there for a year until he was presented with a business opportunity in the music field (a contract from a recording company in Korea, Hyundai Records, to record and publish a solo vinyl record). In 1990, he became a full-time professional musician and moved to Seoul where he lived for the next three years. He released his record (pop/jazz fusion) in 1992. The release sold 20,000 copies, so he made a small amount of money on the deal. In 1993, he performed frequently to promote the record release. He was interviewed for and performed on national television and radio (KBS, MBC, SBS, among others).

In 1993, Mr. Ryu decided he did not want to continue with a musician's lifestyle, so he took a little time off. He had met his future wife in Seoul in 1991. They dated for three years and married in 1994. They remained in Korea for another year and a half while waiting for his wife's immigration papers to be processed before returning to the US. He continued to teach English. He enjoyed being married.

Mr. Ryu and his wife returned to the US in 1996 to live in Los Angeles where they initially resided with his parents. He joined an advertising firm, Park and Foster, as an account executive for the USA/Korean market for MCI Telecommunications Co. He and his wife moved into an apartment. He was at the agency for a year and a half or two. He enjoyed the work and learned a great deal. In 1998, he returned to banking when he took a position as an officer with Center Bank. He remained there through 2006. He became a Senior Vice President in 2003. There he met his mentor, the CEO, Mr. Paul Kim, with whom he continues to maintain a friendship.

In 1999, the couple had their first child. The pregnancy was without incident. They were very happy to be parents. They had a second child in 2003. This pregnancy and

4

birth were also normal.  The children were thriving.  Mr. Ryu enjoyed being a parent and actively participated in parenting activities.

In 2006, Mr. Ryu received an offer from some financiers to move to the East Coast and establish a Korean community bank.  They established Bank Asiana in Palisades Park, NJ.  He was the COO of the bank.  Several branch locations opened up during the next several years.

In 2013, Bank Asiana ($250 million) was sold to Wilshire State Bank.  The sale was finalized on October 1, 2013.  Soon after, all the top management personnel including Mr. Ryu were discharged.  In November 2013, he began work with another group of financiers who planned to acquire New Millennium Bank in New Brunswick, NJ.  The change in control (friendly takeover) occurred in March 2014 ($17 million investment).  He was to become the COO of New Millennium.  In January 2014, prior to the closing, Mr. Ryu noticed that the debit card for his sole bank account at Wilshire Bank was not working.  He had about $55,000 in the account at that time.  He made several calls to try to resolve the problem with no success.  He then received a call from Ms. Karen Chon, Operations Officer at the Ft. Lee branch.  She requested a meeting with him but did not give a reason.  When they met, she informed him that she had stolen money (about one million dollars) from Bank Asiana.  She told him she had implicated him in the theft.  She informed him that she told the bank he was "involved" but provided no details.  He was stunned and suggested that she simply tell the truth which she agreed to do.  She said she did not know why she had lied.  In retrospect, Mr. Ryu feels he should have reported Ms. Chon to the police.  Instead, he trusted her to tell the truth and to correct the situation.  He did not feel it would be a problem if the lie was acknowledged as he had committed no crime.  He also knew that the bank's insurance would cover the theft.  He knew that if the police became involved, and Ms. Chon were to be convicted of bank fraud, she would likely be incarcerated in a federal prison for "a long time."

Mr. Ryu spoke about the problem with Mr. Hong Hur, the CEO who had previously left LA along with him to open Bank Asiana.  Mr. Hur was "stunned."  At the time, Mr. Ryu was making over $200,000 per year and did not need any additional money so would have had no motivation to steal money from a bank or from anyone.  He had a mortgage of $500,000 and credit card debt of $50,000 but was up to date in his payments.  Over the next few weeks, Mr. Hur told him he was hearing rumors about Mr. Ryu from other persons in the local financial industry (investors, banking personnel).  He heard that Wilshire Bank was preparing to recover the stolen money from their insurance company.  He knew they must be filing suspicious activity reports with FinCEN (Treasury Department).  He thought that was perhaps why his debit card was not working properly.

When he called the local branch, the employees there denied having any information about his card malfunctioning and provided no information to resolve the problem.  He then contacted the general counsel for the bank, Ms. Lisa Pai, because he was concerned about the issue of the theft, especially as the bank had not contacted him to

5

investigate Ms. Chon's allegations that he was involved in the theft.  Ms. Pai told him his account had been frozen and that he was under suspicion regarding the theft.  They met with Mr. Michael Yi, an outside attorney for Wilshire Bank on February 13, 2014.  Ms. Pai and Mr. Yi showed Mr. Ryu paperwork that indicated that he was getting paid for the work he was doing for New Millennium Bank (his regular job).  He did not understand why they had this information.  They suspected that he needed money for a personal investment in the bank.  He told them this was not the case.

After the meeting, rumors circulated in the financial community that Mr. Ryu would be "going to jail."  Some of the New Millennium investors raised questions about his integrity.  He had met with Ms. Chon at her request earlier on the day of his meeting with Ms. Pai and Mr. Yi.  He informed Ms. Pai that he had recorded the meeting.  At the meeting with Ms. Chon, she asked to borrow money from Mr. Ryu to pay back the money she had stolen.  He thought her request was "a joke."  He told her to tell the truth immediately because it was causing problems for him.  He had not yet retained an attorney as he assumed there should be no problem showing his innocence.

Mr. Ryu received regulatory approval from the FDIC for the takeover of New Millennium on March 15, 2014, but was denied approval by the NJ Banking Department (NJDOBI).  When he and the attorney working on the merger contacted NJDOBI, they said that Mr. Ryu needed to resolve the issue with Wilshire Bank (who had taken over Bank Asiana) before receiving approval.

It would be typical for the victim (the bank) to contact all involved parties for information before calling the authorities.  Evidently the bank claimed that Mr. Ryu stole the money without even speaking to him.  At this point, out of caution, Mr. Ryu obtained personal legal counsel.

Mr. Ryu was forced to withdraw his name from the merger application.  When they received the FDIC approval, all the investors and the CEO agreed he was not guilty of anything.  They told him that until his name was cleared, he could work in the same capacity on the project; however, on March 19, Wilshire Bank filed Federal civil litigation accusing him of Embezzlement.  Ms. Chon also was served with the same charges.  They also filed civil litigation against him in his capacity as the COO of Bank Asiana.  They alleged that after the merger, he used his computer in violation of policy and also breached his fiduciary duty in allowing the fraud to occur.

On March 20, the allegations became "front page news" in the local newspapers.  The articles stated that Mr. Ryu was a party to the theft of money from Bank Asiana.  Mr. Ryu was mortified and felt publicly humiliated.  He was could not believe that he was now the object of false and devastatingly negative publicity.  More news articles were published on March 21.  On March 25, the CEO and financier/investors fired him (he was the lead founder of the bank but at that point was serving as a consultant).  He had been promised the position of COO at the new bank after the takeover.

6

After March 19, 2014, there was "silence" from the authorities. No one ever contacted him. His attorney called the Plaintiff's attorneys and tried to reason with them, but they would not change their position. They proceeded to freeze the approximately $55,000 in his account at the bank for two years. He notes that this was an illegal action as only a court-ordered lien, IRS and OFAC would have allowed this action. The civil case was put on hold until the criminal case against Ms. Chon was resolved. Remarkably, no criminal charges were ever brought against Mr. Ryu despite the bank's position that he was involved in the fraud. As a result of Ms. Chon's lies, misrepresentation and false allegations, Mr. Ryu's life was put on hold for the next seven years. It was not until 2017 that Ms. Chon was convicted and sentenced (seven years in Federal prison along with restitution).

The report of an investigation by Wilshire Bank of February 25, 2014, indicated that they concluded that "the embezzlement was a well-conceived plan to defraud the bank regardless of whether James was involved." A second report of March 28, 2014, concluded that "the embezzlement was a well-conceived plan to defraud the bank performed by the Operations Officer [Ms. Chon]." The second report was issued nine days after the bank sued him in civil court for acts they had already concluded he was not responsible for. He only later learned this during discovery for his civil legal case three years later.

After having his account frozen and losing his job, Mr. Ryu was "treading water" for the next three years. He was trying to keep from sinking financially and emotionally for the three years it took for resolution of the criminal case of Ms. Chon and for the additional two and a half years it took for his own civil case to wend its way through the courts (his civil case was put on hold during the time her criminal case was pending). He ultimately sued Wilshire Bank which merged into Bank of Hope for malicious prosecution and Ms. Chon for defamation. The case was filed in November or December 2019 because it was two and half years before the bank dropped their civil charges against him (in September 2019). He feels that they had an ulterior motive, attempting to prevent him from starting any new bank which would be a potential competitor.

By March 28, 2014, Wilshire Bank had already concluded from their internal investigation that Mr. Ryu was not involved in the theft and was not at fault. The bank persisted in their lawsuit for five years after this knowledge with full awareness of the havoc that would be wreaked on his life. He believes that when they released his funds in the account after two years, he would walk away. In addition, Wilshire Bank was required to pay his attorney's fees based on a provision in the acquisition agreement requiring Wilshire (the acquiring bank) to pay for any legal fees related to the merger in advance. The bank was paying not only their own legal fees but the legal fees for his defense.

After he lost his job, Mr. Ryu no longer had any income. He tried to find another position but was not able to despite his qualifications and experience. He believed he was being "blackballed" because of the rumors and the negative publicity. If his name is typed into Google, the search pulls up articles in which he is implicated in the fraud

7

against the bank. He believes he applied for a few dozen jobs but appeared in the Korean banking industry as an "embezzler."

Mr. Ryu's level of frustration at this point is intolerable. Nearly seven years of his wife and children's lives have been negatively affected in every imaginable way. Mr. Ryu could not provide and care for his children as he had expected. He could not afford to pay for SAT preparation classes and tutoring to prepare his children for the college application process. He went from being a banking executive to being a person who qualified for and received food stamps because he did not have enough money to purchase adequate food for his family. His wife was unable to work as she is not fluent in English, her second language. He could not pay the mortgage on his home. He tried to get work outside the banking industry, looking to be employed by private companies; however, the rumor about his being "an embezzler" was already general knowledge. He was professionally rejected by his peers and subordinates who ceased communicating with him. One of his wife's sisters suspected that he was involved in the fraud and stopped communicating with his family. He became socially and professionally isolated. His daughter had to take loans to pay for her education under her mother's name and now owes $160,000 at least some of which Mr. Ryu would have been able to pay out of pocket if he had continued his employment.

In 2014, Mr. Ryu's father-in-law who lived in Korea died. Although he was ill, Mr. Ryu feels guilty because he believes that his father-in-law's knowledge of his legal situation was an additional stress that may have hastened his demise. In 2017, his own mother died. She also knew about his legal situation and was highly distressed as a result.

In 2017, the mortgage company (Nationstar) threatened to repossess his home. It was scheduled to be sold under a "sheriff sale" in November 2017, but ultimately, the mortgage company agreed to modify the loan so the family could remain in their home. Unfortunately, the mortgage company again threatened to repossess the home in October 2019 and conduct a "sheriff's sale." When he got the offer of judgment from Wilshire Bank in September 2019 and finally received the money in October, he was able to avoid this catastrophe.

Mr. Ryu has become cynical. He feels it was "utter injustice, hostility and incompetence" which led to his current disastrous circumstances. He tried to send the entire packet of information related to the resolution of the criminal matter to the Board of Directors and the Shareholders of Bank of Hope which merged Wilshire Bank. They were alarmed by his attempt at independent communication and obtained a court injunction to stop him from future communications. The Federal court agreed the bank could cause him to cease and desist. When his attorney appealed this decision to the Third Circuit, Mr. Ryu prevailed.

Mr. Ryu has been juggling money, trying to pay for his credit card debt and his mortgage at the same time while continue living for his family. Over time, he has been unable to keep current with either. He received unemployment compensation but for only three months. He signed up for food stamps. He could not afford the Cobra

8

payments required to continue his family health insurance plan and had to apply for Medicaid coverage for his family. The family members had to find new physicians so their care would be covered under the plan. He saw a cardiologist who can barely and properly communicate with him. He notes that it is very difficult to find physicians who accept Medicaid as reimbursement, particularly specialists. (When he recently got a job in April 2021, he was able to purchase insurance from Cigna).

Mr. Ryu feels his self-esteem has been severely eroded. He is losing his feeling of being a competent male. He is angry and is extremely anxious. He feels he cannot be a proper provider for his family on the most basic level of providing food and shelter and cannot provide for the educational needs of his children. His priority at the current time is attempting to feed his family and keeping a roof over their heads. The children cannot buy school supplies or clothing. It was a major expense to purchase $50 sneakers for his son so he could participate in athletics. The family cannot afford to go out to the movies or to dinner even to eat at a fast food restaurant. He and his wife were in the habit of having their friends over for dinner but can no longer afford to purchase food for others let alone for themselves. In addition, they were shunned by their friends and even family members after they learned of the alleged fraud. In NJ, there is no deposit on cans. Mr. Ryu collects the children's soda cans and takes them to NY so he can redeem them for around $12.00 which pays for four pounds of hamburger meat. He finds his situation to be humiliating. Even now that he has a job, they are still having to be extremely frugal as he is catching up on all the debt he incurred in the past. (His credit card debt was in collections, and he paid all the credit card debt, a total of $35,000, with the judgement so he could get a job at a bank (He reports that he could not get a job in banking with an outstanding account in collections). The impoverishment has affected his credit score. It has gradually increased to 650 or 660, but in the past, it fell as low as 530 as a result of the financial consequences of the false allegations. Prior to the false allegations, his credit score was over 700.

Until recently, Mr. Ryu was unable to find any type of employment in the banking industry. He had temporary projects with Millennium Bank as a consultant for potential mergers and acquisitions, but the work was temporary. All the positions that would have been available to him were filled, foreclosing further opportunities at Millennium until very recently. He suspected that he could not even get a job as a waiter or as a gas station attendant because potential employers would do a criminal background check and review social media and Google news and see he was a suspected criminal. If his legal situation came up in an interview, Mr. Ryu would tell potential employers about what really happened, but in the end, they did not hire him even though he is a highly qualified candidate. He feels they perceived him as "guilty" because of his efforts to "explain away what happened." His self-esteem is "trashed." If he had no hope of prevailing, Mr. Ryu would consider moving to a different country and attempt to get a job and "resurrect" his reputation.

9

Regarding his marital relationship, his legal dilemma has in some ways strengthened his relationship with his wife who is very supportive. On the other hand, the false allegations have also taken a toll. His wife tells him how difficult it is emotionally to see how he has struggled over the past few years and to be helpless to do anything about it. The ambiguity and the uncertainty about the future and when the nightmare might end and what the outcome might be are almost intolerable for both Mr. Ryu and his wife. He and his wife are less intimate as a result of the stress. His sexual relationship with his wife has deteriorated. His libido is very low. He is disinterested in sexual activity whereas in the past, he and his wife had a healthy sexual relationship, having relations a few times a week. He worries that she misses the intimacy.

Mr. Ryu and his family have not been able to take any type of family vacation. He and his wife cannot afford presents for the children for birthdays or the holidays. It is a severe disappointment that they cannot buy even simple basic things for their children. They were forced out of desperation to apply for free meals for school lunches for the children. He worries that their peers will become aware of the situation and that it will be embarrassing for his children. He is upset that he is unable to pay the required fees to the school for scholastic and athletic events. Fortunately, his son who played football could participate only because he was excused from paying the required stipend to the athletic department. His wife is upset because she cannot afford to contribute money to her church.

After his father-in-law and mother died, it was difficult for Mr. Ryu to experience "normal grief." He notes, "I was supposed to help my family at the time, but I felt unable to do it." He learned of his mother's death at 3 am and proceeded to remain awake worrying for the rest of the night about how he would be able to afford to travel to California for her funeral. His father had to pay for his and his wife and children's plane tickets. Under normal circumstances, he would have paid for his mother's funeral expenses but could not afford to do so. In addition, during the time his mother was sick, he could not afford to visit her and help care for her prior to her death. He has severe feelings of regret and guilt that he cannot shake in the aftermath.

When he lost his job, Mr. Ryu lost his benefits including paid sick and vacation leave, health insurance, life insurance, stock option benefits and a 401K with company contributions. He had to deplete his prior savings and his 401K and IRA accounts which were valued at about $150,000. He experienced a total derailment of his career path just as he was achieving a peak of success, his second appointment as the COO of a new bank that was destined for expansion. The next step which he reasonably expected given his prior successes and reputation was to become the CEO of a bank. He does not believe he can ever recoup his status in the banking world nor the trajectory of his career path.

The extreme stress of attempting to deal with the ongoing situation of false allegations is sapping all Mr. Ryu's energy. He feels he is barely coping with the simplest problems of everyday living like ensuring the family has enough food, clothing, a roof over their heads and gas for transportation.

10

He has felt helpless and hopeless since being falsely accused of fraud.  The feelings are wearing him down with the passage of time.  He feels potential solutions are "unreachable, out of my control."  He feels totally demoralized.

Mr. Ryu is extremely angry at the bank and at Ms. Chon who wrongly implicated him, then lied to him about correcting the lie she had told.  He notes that the bank "knew they were doing the wrong thing.  They knew from early on that I was not involved."  He suspects that the bank sued him because of "ancillary motives," that they acted against him to prevent the opening of a new competitor bank.  He is furious at their "unwillingness to let go even after they knew I was not a criminal."

He frequently feels tearful but doesn't allow himself to cry because he feels he has "be strong" and hold back especially around his family.  He has been irritable and bickers with his wife over "stupid things" especially when it involves money, even small purchases.  When he tells his wife she should not buy something he thinks is too expensive given their highly limited budget, he sees the disappointment in her face, and it is painful for him.

Mr. Ryu feels a sense of personal embarrassment after being subjected to public humiliation.  He has a difficult time imagining how he will ever overcome the tarnishing of his reputation as information about his legal cases is in the print news and on the internet.  His name is now associated with embezzlement which is a key issue in the financial world.  He notes, "I was accused of being a thief of BANK money, and I have been in litigation against a BANK for seven plus years."  He believes he will now be identified as "litigious" and that this is a significant barrier to his being employed in the banking industry and financial industries in the future.  He assumes that everyone knows about his legal situation and that it is "like a black mark."

As a result of the bank's actions and what he felt was a violation of his trust in an institution to "do the right thing, follow the path to justice," he now feels distrustful.  He has become "cynical to say the least."  He feels betrayed.  He notes, "The bank is supposed to keep your money and care for it and allow you access to it.  The bank instead purposefully kept the money from me which led to enormous stress for two years."  No matter what information he presented to the bank, they did not change their position.  He was exceedingly frustrated that he could not impact the system despite providing information to contradict the false allegations.  He notes, "Things just kept rolling along, depriving me of my right to my money and depriving me of my reputation."  He notes, "If it lasted just a year, it would have been much easier.  But then they added seven years to that, and it's not finished yet…."

The incidents have been damaging to his relationship with his children.  He constantly feels guilty towards his children.  He believes the children feel bad for him and feel guilty about asking for almost anything, even essentials.  It is a burden for them to have to focus on every dollar spent.  He feels the situation is causing alienation between himself and his family members.  The time has passed, and he cannot now go back to repair

11

some of the damage (getting SAT prep classes, tutorials, obtaining essentials, the embarrassment of free lunches, etc.)

Because of his legal situation and the financial strain and limitations, Mr. Ryu has become socially isolated. He rarely goes out and rarely engages in any leisure time activities. Previously, he would go bowling with the family, visit baseball batting cages with his children, go skiing in the winter at local ski resorts and take a yearly winter ski vacation. He had to cancel his son's membership at a local gym. His son and daughter had both been taking music lessons (guitar and piano), but he was forced to discontinue the lessons among other activities. The children missed several school trips because he could not afford the fees. (They were able to go on some trips which were provided gratis as part of the same program as the free school lunches).

Mr. Ryu has found it much more difficult to focus and maintain sustained mental activity. He feels that even if he were to be placed in his prior position, he would be less productive as it would be difficult to carry out some of the functions of his role. If he had to accomplish a complex task such as putting together a package of information to send to Shareholders or the Board of Bank of Hope, he is not sure he could do it.

After the false allegations, Mr. Ryu developed physical symptoms including occasional upset stomach and heartburn, muscle tension in his shoulders and back and tachycardia up to 200 BPM which would continue for hours, sometimes all night and all day. It was very frightening as the episodes were highly unpredictable.

In fact, on the day of his interview, several times during the interview, he experienced the tachycardia which was confirmed by an examination of his pulse rate. During the times he was experiencing the tachycardic episodes, he would also sweat profusely and feel extraordinarily anxious.

Mr. Ryu is worried about the impact of a psychiatric diagnosis or treatment on his future insurability for life, health, disability or other insurances. In addition, it is not in his cultural norm to seek or receive psychological or psychiatric care. Despite this, he is eager to engage in psychological and psychiatric treatment which he hopes will alleviate some of his symptoms of depression and anxiety and will help him learn better methods of coping with the ongoing stress in his life. Up until recently, he has been on Medicaid would have made it extremely difficult to find appropriate caregivers with the expertise to provide the intensive psychological and psychiatric care he requires.

By July 2019, Wilshire Bank merged with another bank (BBCN) and became Bank of Hope. In July 2019, Bank of Hope approached his attorney and told him there was no reason to go to litigation over the seizure of his $55,000 for two years. They made an offer of $350,000 to resolve the case. He had a temporary consultant job at that time at New Millennium Bank. Bank of Hope kept delaying their offer and then changed their position despite committing to the offer in front of a judge. They lowered their offer, and he accepted it in or around September 2019. During the gap, there was a great deal of frustration because he was potentially facing losing his house under a "sheriff sale." He

12

and his wife got into an argument, yelling at each other over "nothing much" which was a result of the level of frustration, anxiety and fear they had both been dealing with for years. His son pushed him, and Mr. Ryu fell but was not injured. They decided they needed to cool down for a few days, and he anticipated she would stay with a friend for a short while. His wife had a different idea. She and the children moved into the house of a friend from church, subletting at a very inexpensive cost of $1,000 per month.

There was no physical altercation between Mr. Ryu and his wife. Mr. Ryu was shocked and upset over the separation. They were about to lose the house, but there was an offer of settlement in the works. His wife and children lived separately from him from August 2019 through March 2020. Since the family has been reunited, he and his wife have been getting along better. During the pandemic, the situation was difficult as they were living in isolation, but for him and his family, it was somewhat of a relief as the pandemic allowed him to remain out of the public light. He notes, "I stayed home for seven years." Ironically, as a result of the negative consequences of his legal situation, Mr. Ryu had become "a pro at that lifestyle."

MEDICAL HISTORY

In his early 40's, Mr. Ryu was diagnosed with hypertension and was medicated with Lotrel of an unknown dosage for a few years. The hypertension resolved after he lost about 10 pounds. After engaging in attempts to correct the false allegations and being forced to engage in litigation, he developed cardiac problems including new hypertension, tachycardia and palpitations. He was treated by Dr. Chaudry with Toprol XL 5 mg twice a day and Vasotec 5 mg once a day. He is also noted by his physician to have shortness of breath, a new heart murmur and anxiety related to situational stress. He was started on the antidepressant medication, Zoloft 25 mg per day on February 16, 2017. It was recommended that he maintain a low sodium, low cholesterol and low calorie diet with no alcohol and no caffeinated beverages. At the time, he was also taking ASA 81 mg.

When he was originally seen on September 2, 2016, a stress test was ordered as well as a referral to a cardiologist. He was prescribed Xanax .25 mg to take as needed. Holter monitor results showed a sinus tachycardia. He also received a prescription for Percocet 5/325, one or two as needed on August 16, 2016, prescribed by his primary doctor for an unknown reason. He never took the opioid or the Xanax. He reports having palpitations ongoing up through the current time despite the normal Holter exam. When he has the palpitations, he becomes lightheaded and nearly passes out. At times, the tachycardia wakes him at night. (During my examination of him, Mr. Ryu had multiple periods of sweating, tachycardia and irregular heart rhythm lasting for several minutes.) More recently, he continued to have episodes of tachycardia at unpredictable times. Now that he has proper insurance, he plans to see a specialist. He worries that he may have atrial fibrillation as his heart rate rises to 200 beats per minute at times almost every day. Episodes last on and off for hours at a time.

He has never been hospitalized or had any surgery.

13

LEGAL HISTORY

Prior to the current case, Mr. Ryu had never been the plaintiff or defendant in any civil litigation. He was issued a restraining order in 2006. He was upset over a failed business investment with his wife's brother. When he broke several dishes, his wife became fearful. In 2006, he was detained for violating the restraining order. Ultimately, the restraining order and the violation were expunged from his record.

FAMILY HISTORY OF PSYCHIATRIC DISORDER

To the best of his knowledge, none of his first degree blood relatives suffers from any psychiatric disorders.

HISTORY OF PSYCHOLOGICAL/PSYCHIATRIC TREATMENT

Mr. Ryu has never been treated with any psychosocial interventions (counseling, psychotherapy) nor has he ever seen a psychiatrist for treatment with psychotropic medications. In 2017, he was diagnosed by his family practitioner with anxiety and stress related to an improper legal charge. He was suffering from insomnia, palpitations and tachycardia. He was prescribed an antidepressant medication, Zoloft, 25 mg per day. He took the medication for a month and received no benefit. He was also prescribed Xanax .25 mg as needed but this was also of no benefit. His physician at the time referred Mr. Ryu for psychotherapy, but after being placed on a waiting list, he was never contacted. Recently he called the facility (Care Plus in Paramus, NJ) and had an initial interview to determine his eligibility and need for services. His request for services was pending. He went to see a female therapist, a counselor, a few times in July 2019 but did not continue because he felt he was just telling "a sob story." It depressed him further and made him angry. He also felt the therapist was not helping him. Culturally, it was also difficult. At that time, Mr. Ryu and his wife were also beginning their separation. His wife encouraged him to continue, but he could not tolerate it at the time.

HISTORY OF ALCOHOL/SUBSTANCE USE

During his senior year in high school, Mr. Ryu would drink a few beers once or twice a week. At the current time, he drinks on average a few beers once or twice a week. He has never drunk alcohol to excess on a regular basis.

He has never used any type of illicit substance nor has he ever used prescription medications other than as prescribed by his physician.

CURRENT AND PRIOR PSYCHIATRIC DISORDER

Prior to the incidents beginning in 2014, Mr. Ryu demonstrated no significant psychiatric symptoms or disorders. He was an even-tempered and fully functional person.

14

During and subsequent to the incidents of being falsely accused of fraud, losing his job and having his reputation destroyed, he developed significant symptoms of DSM-V Generalized Anxiety Disorder (GAD).  He reports having excessive anxiety and worry (apprehensive expectation) occurring more days than not for at least six months, about a number of events or activities (such as work or school performance).  Onset was in the first weeks he learned about the false accusations made by the female bank employee who was implicating him in a theft in late January.  His anxiety became much worse when he was the object of a civil suit in March 2014.  The anxiety became extreme when false information about him was published in the newspapers, including USA Today, and appeared on the internet, and reporters were calling him.

He finds it difficult to control the worry.  He is unable to push it out of his mind.  He worries constantly.  He notes that the worries are "real" worries about real things, not phantom worries.

The anxiety and worry are associated with the following symptoms (with at least some symptoms having been present for more days than not for the past six months): restlessness and feeling on edge, being easily fatigued, difficulty concentrating, irritability, muscle tension and sleep disturbance (difficulty getting to sleep mainly from unexpected tachycardias, difficulty staying asleep as he wakes up with his heart racing at least twice a week and as often as every night).

The anxiety, worry or physical symptoms have caused and continue to cause him clinically significant distress and impairment in his social, occupational and other important areas of functioning.  The disturbance is not attributable to the physiological effects of a substance or another medical condition.  The disturbance is not better explained by another mental disorder.

The GAD is only about 20% better at the current time, improving primarily since he obtained employment.  He is still worried about his family and his financial condition (the forbearance of his home), his reputation, his work situation (adjusting to the workplace after being unemployed for such a long period of time) and his future career and future finances.

During and subsequent to the incidents of being falsely accused of fraud, losing his job and having his reputation destroyed, Mr. Ryu also developed DSM-V symptoms of a Major Depressive Disorder, Single Episode, Moderate.  He experienced the following symptoms present during the same two-week period and representing a change from previous functioning: depressed mood most of the day, nearly every day, as indicated by subjective report (e.g., feels sad, hopeless) and observation made by others (his wife sees he is tearful); markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by his subjective account and his wife's observation - he finds it "hard to have the same zest for life"); insomnia; fatigue and loss of energy nearly every day; feelings of worthlessness and excessive or inappropriate guilt (but not every day); diminished ability to think and concentrate nearly

15

every day (by subjective account); and recurrent suicidal ideation without a specific plan (he periodically feels that "it really ain't worth it." He has no specific plan. The presence of his wife and children would prevent him from acting on these feelings. At the times he feels this way, he tells himself, "Be cool, dude."

The symptoms have caused and continue to cause him clinically significant distress and impairment in his social, occupational and other important areas of functioning. The episode is not attributable to the physiological effects of a substance or to another medical condition. There has never been a manic episode or a hypomanic episode.

The symptoms of MDD have improved only about 20%. His mood is only slightly better as is his anhedonia. His energy remains low, and he finds it hard to readjust to working full time. It is sometime difficult to concentrate. He is still restricted socially. Sometimes his wife goes out, and he remains home as he just doesn't feel like socializing.

SUMMARY AND CONCLUSIONS

Mr. Ryu is a man who, had a normal birth, childhood and adolescent development. He adapted without problem after his family immigrated from Korea to Los Angeles when he was 13. He performed well academically and had a normal social development. He obtained a bachelor's degree. He had careers in banking and music and worked in the advertising business before settling on banking as a career. He married and had two children. His children thrived. He had a loving marital relationship.

He developed a successful career in banking, starting as an officer in 1998 and moving up to senior vice president by 2003. When he moved to the East coast for an opportunity to start a new bank, he became the COO of Bank Asiana. The bank was sold to Wilshire in 2013. Although he lost his job, soon after, he had an opportunity presented by several financiers to takeover New Millennial Bank in March 2014. He was to be the COO. He was in the process of acquiring permission from the FDIC and the NJDOBI when he was falsely accused of embezzlement by Ms. Chon. Although she reassured him she would correct the lie she told about his involvement in her theft of a million dollars from Bank Asiana, she did not do so. Subsequently, his account was frozen for two years. When the accusations became public, his career and reputation were destroyed. He was unable to find a job because of the false accusations and ensuing publicity and became financially destitute, barely scaping by in his efforts to support his family.

In the aftermath of the false accusations, Mr. Ryu developed two DSM-V major psychiatric disorders, Generalized Anxiety Disorder and Major Depressive Disorder. He had never previously suffered from any significant psychiatric symptoms nor disorders nor had he ever been treated by any type of therapist or counselor nor had he taken any psychotropic medications. Subsequent to the allegations, his internist diagnosed him with anxiety and depression and treated him with antidepressant and antianxiety medications. More recently, he was also briefly involved in treatment with a therapist

16

In addition to developing major psychiatric conditions, Mr. Ryu also suffered a vast array of additional psychological symptoms and negative consequences of the false allegations. These insults and injuries have been described in detail above. There is almost no area of his life which has not been negatively impacted by the false allegations.

Mr. Ryu requires treatment with psychotherapy and psychotropic medication for his anxiety and depressive disorders. Although he was treated with Zoloft and Xanax in the past, he was placed on a very low and likely sub-therapeutic dose of Zoloft. He would benefit from treatment with an adequate dose of an SSRI or other antidepressant medication which would address both anxiety and depressive symptoms. He may also require treatment with additional anti-anxiety medication in the form of Buspar or a benzodiazepine such as Klonopin or Ativan and medication to address his sleep symptoms (trazodone or a sedative-hypnotic medication) until his depression is in remission. He should be treated by a psychiatrist with knowledge and expertise in the specialty area of psychopharmacology. He will require initial evaluation and followed by regular sessions for monitoring his medication. The sessions should occur initially on a monthly basis and, when his symptoms have improved adequately, at two to three-month intervals. He should remain on the medication for nine to 12 months after remission has been achieved. At that point, an attempt to taper the medication may be attempted. He may require treatment for an extended period of time if his life circumstances do not improve substantially, and if he continues to experience ongoing stress as a consequence of his legal situation.

Weekly individual psychotherapy is also indicated to help improve symptoms of depression and anxiety and to help him recover from the many ways in which the false allegations have ravaged his life. Psychotherapy should focus on improving his self-esteem, repairing his self-image, addressing feelings of humiliation and shame especially in the context of gender and culture (his sense of failure as a male breadwinner and as a husband and father and his sense of shame as an Asian male). Therapy should also assist him in reducing and resolving feelings of anger and resentment. When he engages in treatment, he will incur direct costs of the treatment (professional fees, costs of transportation to and from sessions, costs of psychotropic medication) and productive time lost while engaged in treatment-related activities.

With appropriate treatment as described above, Mr. Ryu should achieve reduction and ultimate remission of his anxiety and depressive disorders. Given the duration of his symptoms and dysfunction, the course of his improvement may be lengthy, up to several years depending on his response to psychotropic medication and the progress of the therapies recommended. Getting his career back on track and having financial reparation leading to increased financial security will assist in this process of recovery.

Regarding his current marital relationship, he and his wife are getting along better since some of the financial stress has been allayed and since he has obtained employment, but they are not back to their normal relationship. They would be amenable to engaging

17

in couples therapy to address remaining stresses from the false allegations including their sexual relationship which he currently describes as "poor."

Regarding the relationship with his children, he still feels alienated somewhat from his children. His relationship with his son is better than with his daughter. He notes that throughout the time of the false allegations and with the ensuing consequences, his daughter was very angry at her father as well as at the bank and the woman who falsely accused him. She felt frustrated that her father could not do more to rectify the situation and could not understand that legal matters can take many years to reach a resolution. He wishes he could move back in time to when his children were adolescents, and he could do the things he would have done for them. A brief course of family therapy to address and help the family grieve their losses would be beneficial in helping to reestablish and repair Mr. Ryu's relationship with his children and his wife.

Although Mr. Ryu obtained a job recently, his current position is not commensurate with his prior position and his readiness to become the COO, or CEO of a bank. He would benefit from sessions with an executive coach to assist him in reestablishing and furthering his career in banking or developing a career in another associated area of finance in which he has expertise. He will require assistance in revising his CV, job search and practice in interviewing especially given the extended period of time he was absent from the workplace. The services of an IT expert in addressing and attempting to manage/mitigate negative information regarding the false allegations on the internet and social media would also be of benefit. This would be a complicated approach to undertake. He has gone so far as to consider changing his name to avoid having adverse information come up when persons search his name on the internet. At the same time, he feels he should not have to take such drastic action to attempt to mitigate damage to his reputation as he did not do anything wrong.

Financial remuneration will be of assistance in reestablishing Mr. Ryu's financial security given that he has been virtually destitute after being unemployed for seven years.

It should be noted that prior to the false allegations, he was financially stable and making a salary of about $200,000 per year with full benefits. He was on an upward career trajectory which would have likely resulted in positions of increased yearly compensation. After the false allegations, he lost his job and was not able to obtain employment for seven years. Thus, he has lost wages, and the compounding impacts continue. Mr. Ryu feels his life has been "ravaged" by years of living in poverty and is not sure that he will ever be able to recover financially.

Although much of the negative impact of the false allegations can be mitigated by treatment, by his returning to the workplace with meaningful employment and by restoration of his financial stability, some of the damages may be permanent such as the public humiliation, the ruination of his reputation in the financial services field, the damage to his respect and status in the Asian community and the impact of his financial devastation on his wife and children

18

Mr. Ryu strongly feels that he "needs to seek justice." He states, "I would hate to see anyone else go through what I've gone through. Just about anybody would go crazy having to go through this." He feels the vast consequences of the false allegations have taken a severe toll on him in the best years of his life. He notes, "I feel I have lost seven years from my son and daughter and my wife. That's a lot of years, 28 plus years combined separately sequenced, and the suffering is not over yet. "

Sincerely,

Susan J. Fiester, MD